[No. B011269. Second Dist., Div. Six. Aug. 13, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE FRANCIS ZACK, Defendant and Appellant.

**COUNSEL**

Norman W. de Carteret, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**YEGAN, J.***—George Francis Zack was convicted of first degree murder (Pen. Code, §§ 187, 189) and was sentenced to state prison for 25 years to life. He contends: "I. The court erred when it admitted evidence of prior bad acts against defendant over objection and instructed the jury from CALJIC 2.50 [on] evidence of other offenses. II. The court ruled that *all* prior statements of defendant were admissible, allowed the plaintiff to play tapes and present transcripts and testimony of innumerable exculpatory and irrelevant statements of defendant, allowed ostensibly impeaching testimony, allowed plaintiff to argue alleged false statements to show a consciousness of guilt, and instructed the jury on consciousness of guilt. III. The court erred when it allowed testimony that Theresa [F.] consulted with attorney John Smiley who obtained a restraining order."

The People introduced uncontradicted evidence that Theresa F., the decedent herein, was murdered at approximately 3 a.m. on January 21, 1982. Her body was found in her car in the Dakota Apartments parking lot. Cause of death was aspiration of blood due to strangulation and five or six applications of blunt force trauma to the head and neck. In addition, there were 21 injuries on her body, including 2 fractured ankles. She was literally beaten to death. Significantly, there was no evidence of sexual assault, robbery or any other independent felonious purpose.

---

*Assigned by the Chairperson of the Judicial Council.

The circumstantial evidence against appellant was compelling. Appellant met the decedent in 1973 when they were employed at the Point Mugu Naval Base. After dating, they lived together in a stormy "up and down" relationship commencing in 1978 and ending in 1980. During that period, they jointly acquired property. As a result thereof and upon separation, appellant executed a $10,000 promissory note payable to the decedent which was due April 1, 1982, two months after her demise. The decedent's grandson, Wes, also lived with appellant and the decedent between 1978 and 1980. Wes and appellant did not get along, partly as a result of watching appellant, on several occasions, use force upon the decedent, the last application of which resulted in her having two black eyes. Appellant threatened to kill the decedent if she left him.

After the decedent moved into the Dakota Apartments, she and appellant continued to experience problems. Appellant accused Wes and the decedent of committing a burglary of his residence. The decedent retained Attorney John Smiley who, with appellant's attorney, obtained mutual restraining orders prohibiting harassment.

Notwithstanding the restraining order, several residents at the Dakota Apartments saw appellant or his distinctive orange Toyota truck with a white camper shell and a "crease" in the rear fender at the Dakota Apartments between November of 1981 and the day before the murder. The parking lot where the decedent's body was found was ordinarily illuminated by an overhead light. On the day of the murder, the bulb was not operative, not because it had burnt out, but because it had been unscrewed.

The police found four distinctive bloody heel prints on the pavement near decedent's body. Appellant was required to wear Knapp safety shoes at his work at Point Mugu. The heel impressions from appellant's Knapp safety shoes had 15 to 20 points of similarity with the bloody heel impressions at the crime scene. There were no points of dissimilarity. The circular wound to decedent's cheek corresponded to a Seiko watch owned by appellant. Although disputed, both a police officer and Doctor Gerald Vale, a forensic dentist, opined that appellant's wrist watch made the subject wound. In addition, a minute amount of blood was found on appellant's watch.

The day after the murder, appellant was questioned after advisement and waiver of his constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). During the interrogation, appellant made several statements which were at variance with other evidence. First, aware that blood was found under the decedent's fingernail, the police noticed that appellant had scratches on his face and abrasions on his lip. Appellant explained that he received these injuries in

an altercation involving two hitchhikers on a recent fishing trip from which he had just returned. Second, he indicated that he had spent the night of the murder in his truck at San Simeon. Later, he claimed that he had spent the night in Carmel. Third, he described with particularity the Carmel gas station where he claimed to have purchased gas. Investigation revealed that the subject station had stopped selling gas on January 10, 1982, approximately 10 days before the murder and appellant's fishing trip. Fourth, appellant claimed to have turned in his Knapp safety shoes to obtain new ones. A coworker, however, saw appellant simultaneously in possession of both pair. Fifth, he initially denied having ever threatened decedent. Thereafter, he said that the threats were "superfluous." Sixth, appellant claimed to have been fishing in Carmel. However, at the subject time, Carmel was experiencing a major rain storm and cold weather, with winds to over 30 miles per hour and ocean waves in excess of 10 feet. It even included unprecedented hail.

Appellant's first contention is without merit. In ruling that the People could introduce evidence of appellant's prior assaults on the decedent, the court expressly relied upon *People* v. *Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628], and determined that *People* v. *Deeney* (1983) 145 Cal.App.3d 647 [193 Cal.Rptr. 608] was distinguishable. We quickly dispose of appellant's Evidence Code section 352 claim. Consistent with decisional law (e.g., *People* v. *Frank* (1985) 38 Cal.3d 711, 731 [214 Cal.Rptr. 801, 700 P.2d 415]; *People* v. *Montiel* (1985) 39 Cal.3d 910, 924 [218 Cal.Rptr. 572, 705 P.2d 1248]), the trial court with meticulous precision expressly articulated its thought process in overruling appellant's Evidence Code section 352 objection. The trial court's determination was not an abuse of discretion, i.e., arbitrary, whimsical, or capricious, and, not being erroneous as a matter of law, must be sustained on appeal. (*People* v. *Alfaro* (1976) 61 Cal.App.3d 414, 423 [132 Cal.Rptr. 356]; *People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].)

In *People* v. *Daniels, supra,* 16 Cal.App.3d 36, the defendant argued that his prior assaults on his wife were ". . . proof of prior offenses inadmissible under the rule stated and applied in *People* v. *Kelley* [1967] 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947], and *People* v. *Haston* [1968] 69 Cal.2d 233, 246-247 [70 Cal.Rptr. 419, 444 P.2d 91]." (At p. 45.) The court held: "Evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense. . . . Evidence relevant as proof of motive or behavior pattern is not inadmissible because it also is proof of prior crimes. . . ." (At p. 46; see also *People* v. *Haylock* (1980) 113 Cal.App.3d 146, 150 [169 Cal.Rptr. 658]; *People* v. *Benton* (1979) 100 Cal.App.3d 92, 98 [161 Cal.Rptr. 12].) The *Daniels* rule is based in part on the early California Supreme Court cases of *People* v. *Weston* (1915) 169 Cal. 393,

396 [146 P. 871], and *People* v. *Soeder* (1906) 150 Cal. 12, 15 [87 P. 1016], the first of which indicates "'[E]vidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person for a crime, and thus to solve a doubt, ". . . as to the identity of the slayer . . ." is admissible against a defendant, however discreditably it may reflect on him, and even where it may show him guilty of other crimes.'" This principle has our California Supreme Court's express imprimatur as late as 1960. In *People* v. *Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53], the court said: "Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted and is competent to show the motive and state of mind of the defendant." (See also *People* v. *De Moss* (1935) 4 Cal.2d 469, 473 [50 P.2d 1031].)

Without resort to a "distinctive *modus operandi*" (*People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91]), "signature" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 632 [205 Cal.Rptr. 775, 685 P.2d 1126]), "calling card" (*People* v. *Tassell* (1984) 36 Cal.3d 77, 86 [201 Cal.Rptr. 567, 679 P.2d 1]) analysis of *other factors*, ". . . the common mark of the identical perpetrator and identical victim in both the charged and uncharged offenses is so distinctive that it adds persuasive support to the inference that defendant and not some other person was the perpetrator . . . ." (*People* v. *Beamon* (1973) 8 Cal.3d 625, 633 [105 Cal.Rptr. 681, 504 P.2d 905]; see also *People* v. *Haston, supra,* at pp. 249-250; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 273-274 [70 Cal.Rptr. 438, 444 P.2d 110]; *People* v. *DeRango* (1981) 115 Cal.App.3d 583, 589-590 [171 Cal.Rptr. 429]) and renders the prior evidence admissible on the issue of identity.

The California Supreme Court's ". . . statements of law remain binding on the trial and appellate courts of this state [citations] and must be applied [where as here] the facts of a case are not fairly distinguishable from the facts of the case in which [it has] declared the applicable principle of law." (*People* v. *Triggs* (1973) 8 Cal.3d 884, 890-891 [106 Cal.Rptr. 408, 506 P.2d 232].)[1]

 Quite apart from California Supreme Court precedent, common sense, experience and logic compel the conclusion that the "distinctive

---

[1]To the extent that *People* v. *Deeney, supra,* 145 Cal.App.3d 647, expresses a contrary view, we decline to follow it. There, the court engaged in a "distinctive modus operandi" analysis and concluded that appellant's prior assaults upon his wife ". . . did not tend to identify him as [his wife's] killer." (At p. 654.) While the court did indicate that appellant's ". . . prior misconduct could have been admitted to rebut the assertion of accidental death . . ." (p. 655), it held that ". . . the court abused its [Evid. Code, § 352] discretion by admitting it." (P. 656.)

modus operandi," "signature," "calling card" analysis in the cases relied upon by appellant (e.g., *People* v. *Nottingham* (1985) 172 Cal.App.3d 484 [221 Cal.Rptr. 1]) is inapplicable in the present context.[2] Here, given the brutal and unique nature of the murder, appellant's prior assaults upon the decedent, of necessity, could not survive a "distinctive modus operandi" analysis. One cannot kill the same person twice. Yet, appellant expressly contends that he had not previously broken the decedent's two ankles, nor had he previously inflicted twenty-one wounds to her body, nor had he previously bludgeoned her about the head.

From these precedents, as well as common sense, experience, and logic, we distill the following rule: Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a "distinctive modus operandi" analysis of other factors.

A trial is a search for the truth. (See Pen. Code, § 1044; *People* v. *Carlucci* (1979) 23 Cal.3d 249, 255 [152 Cal.Rptr. 439, 590 P.2d 15].) The rules of evidence are designed to further this search, and to that end the Legislature has expressly provided for the admissibility of other acts to show ". . . motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." (Evid. Code, § 1101, subd. (b).) In another context, our Supreme Court has indicated: "No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (*People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1]; see also *People* v. *Douglas* (1977) 66 Cal.App.3d 998, 1007 [136 Cal.Rptr. 358].) So here. Appellant was not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship and their parting were peaceful and friendly.

We also reject appellant's subsidiary claim that the trial court's limiting instructions concerning the appropriate and inappropriate use of

---

[2]"In order for evidence of a prior crime to have a tendency to prove the defendant's identity as the perpetrator of the charged offense, the two acts must have enough shared characteristics to raise a strong inference that they were committed by the same person. It is not enough that the two acts contain common marks: '[T]he inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, *logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety* and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.' [Citations.]" (*People* v. *Rivera* (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362], italics in original.)

the prior assaults were error.[3] He relies on *People* v. *Gibson* (1976) 56 Cal.App.3d 119, 130 [128 Cal.Rptr. 302], which states: "It is the essence of sophistry and lack of realism to think that an instruction or admonition to a jury to limit its consideration of highly prejudicial evidence to its limited relevant purpose can have any realistic effect. It is time that we face the realism of jury trials and recognize that jurors are mere mortals. Of what value are the declarations of legal principles with respect to the admissibility of other-crimes evidence such as are found in *Thornton, Schader* and *Sam* [*People* v. *Thornton* (1974) 11 Cal.3d 738 (114 Cal.Rptr. 467, 523 P.2d 267); *People* v. *Schader* (1969) 71 Cal.2d 761 (80 Cal.Rptr. 1, 457 P.2d 841); *People* v. *Sam* (1969) 71 Cal.2d 194, 206 (77 Cal.Rptr. 804, 454 P.2d 700)], if we permit the violation of such principles in their practical application? We live in a dream world if we believe that jurors are capable of hearing such prejudicial evidence but not applying it in an improper manner."

The *Gibson* observations are here inapposite. The California Supreme Court has consistently stated that on appeal, "[w]e must, of course, presume that the jury followed [the trial court's] instructions . . . ." (*People* v. *Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d 907]; see also *People* v. *Turville* (1959) 51 Cal.2d 620, 636 [335 P.2d 678]; *People* v. *Foote* (1957) 48 Cal.2d 20, 23 [306 P.2d 803]; *People* v. *Kemp* (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913].) There is no evidence that the jury ignored the court's instructions and committed misconduct by using limited evidence for an improper purpose. "In the absence of evidence to the contrary, the presumption [that the jury adhered to the limiting instructions] will control." (*People* v. *Beach* (1983) 147 Cal.App.3d 612, 625 [195 Cal.Rptr. 381].)

Appellant's second contention is also without merit. "Evidence of a statement is not made inadmissible by the hearsay rule when offered against

---

[3]The court gave modified CALJIC No. 2.50: "Evidence has been introduced for the purpose of showing that the defendant may have committed a crime or crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] A motive for the commission of the crime charged[.] [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

In addition, the court gave CALJIC No. 2.09: "Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] You are again instructed that you must not consider such evidence for any purpose except the limited purpose for which it was admitted."

the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." (Evid. Code, § 1220.) "Statements to be admissions need not be incriminating." (*People* v. *Perkins* (1982) 129 Cal.App.3d 15, 23 [180 Cal.Rptr. 763]; *People* v. *Aho* (1984) 152 Cal.App.3d 658, 663 [199 Cal.Rptr. 671].) As aptly stated by Witkin, ". . . any prior statement of a party may be offered against him, even though it may not have been against his interest or even may have been self-serving when made." (Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 498, p. 470.) ■ Here, the People introduced all of the extrajudicial statements appellant uttered in an attempt to persuade the jury that appellant was untruthful in his explanation as to his whereabouts at the time of the murder. "[W]hen each of the statements is isolated from the others it is entirely exculpatory. However, 'statements merely intended to be exculpatory by the defendant are often used . . . to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word . . . .' (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 477 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 10 A.L.R.3d 974].)" (*People* v. *Fulks* (1980) 110 Cal.App.3d 609, 617 [168 Cal.Rptr. 203].)

Viewed in the context of the theory on which they were presented, all of appellant's extrajudicial statements were material ". . . to the issue of [his] guilt or innocence . . . . Such falsifications cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances, and thus are admissions of guilt. [Citations.]" (*People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397].)

Nevertheless, relying on *People* v. *Morgan* (1978) 87 Cal.App.3d 59 [150 Cal.Rptr. 712], and *People* v. *La Salle* (1980) 103 Cal.App.3d 139 [162 Cal.Rptr. 816], appellant contends that the extrajudicial statements were inadmissible. (Cf. *People* v. *Kane* (1984) 150 Cal.App.3d 523, 532 [198 Cal.Rptr. 73].) In *People* v. *Morgan, supra,* the People did not offer the defendant's extrajudicial statements for the truth of the matters asserted, and, in fact, they were offered to show the opposite, i.e., not for a hearsay purpose. (Evid. Code, § 1200.) To be admissible, they ". . . must be based on the circumstantial-evidence-reasoning process. . . ." (*People* v. *Morgan, supra,* 87 Cal.App.3d at p. 68; see also *People* v. *La Salle, supra,* 103 Cal.App.3d at p. 150.) To this extent, we agree. However, to the extent that *People* v. *Morgan, supra,* at page 69 and *People* v. *La Salle, supra,* at page 152 require the falsity to stem from defendant's own inconsistent statements, as opposed to other independent evidence, we most respectfully disagree. The theory of these cases is that for the trier of fact to draw the inference of falsity and consciousness of guilt is unreasonable inference

drawing and ". . . would amount to speculation of the rankest sort." (*People* v. *Morgan, supra,* at p. 69.)

The facts of this case illustrate that this rationale should be rejected. For example, we do not believe it to be the rankest sort of speculation for the jury to have drawn the inference that appellant was lying when he said he was fishing in Carmel at a time when it was experiencing an unprecedented rain and hail storm or that he purchased gasoline from a station with inoperative pumps. From our perspective, the inference that such explanations are untrue permits the drawing of the next inference of consciousness of guilt. "Here defendant did not simply deny his guilt; he ventured upon an explanation so unusual that the triers of fact could conclude that it was an intentional fabrication indicating consciousness of guilt and the absence of any true exculpatory explanation." (*People* v. *Wayne* (1953) 41 Cal.2d 814, 823 [264 P.2d 547].) The falsity of an extrajudicial statement may be demonstrated by independent evidence thus permitting the trier of fact to draw the inference of consciousness of guilt. (See *People* v. *Wayne, supra; People* v. *Showers* (1968) 68 Cal.2d 639 [68 Cal.Rptr. 459, 440 P.2d 939]; *People* v. *Amador* (1970) 8 Cal.App.3d 788 [87 Cal.Rptr. 662].)

■ With this evidentiary foundation, the court did not err in instructing the jury on consciousness of guilt.[4] "False statements regarding incriminating circumstances made by a defendant prior to trial are admissible because they may support an inference of consciousness of guilt. [Citation.] Thus, the giving of CALJIC No. 2.03 is justified [where, as here,] there is evidence that a defendant fabricated a story to explain his conduct." (*People* v. *Louis* (1984) 159 Cal.App.3d 156, 160 [205 Cal.Rptr. 306].)

■ Finally, we need not reach the merits of appellant's contention that the decedent's retaining Attorney Smiley to obtain a restraining order was nonverbal conduct that she was afraid of appellant and inadmissible by reason of *People* v. *Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338], which prohibited such statements to show fear that he might kill her. "Issues relating to the admissibility of evidence will not be considered on appeal absent a timely objection in the trial court. [Citation.]" (*People* v. *Easley* (1983) 34 Cal.3d 858, 873 [196 Cal.Rptr. 309, 671 P.2d 813].) In any event, decedent's retaining an attorney and obtaining a restraining order was not ". . . intended by [her] as a substitute for oral or written

---

[4]The court gave CALJIC No. 2.03 (1979 rev.) which provides: "If you find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

verbal expression." (Evid. Code, § 225.) As to the claim that the signed restraining order itself was hearsay, it is sufficient to observe that it was admissible as an official record. (Evid. Code, § 1280; see also, e.g., *Fisk* v. *Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 76-79 [179 Cal.Rptr. 379, 31 A.L.R.4th 905].)

The judgment is affirmed.

Stone, P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied September 11, 1986, and appellant's petition for review by the Supreme Court was denied November 26, 1986.